

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===========================X
STEVEN TURNER,

     Plaintiff,

        -against-

ALEXANDRA INVESTMENT MANAGEMENT,
LLC,

     Defendant.

===========================X

COMPLAINT

Docket No.:

PLAINTIFF DEMANDS A
TRIAL BY JURY

Plaintiff STEVEN TURNER, by his attorneys, MORELLI RATNER PC, complaining

of the Defendant herein, upon information and belief respectfully alleges as follows:

    1.     Plaintiff STEVEN TURNER is a resident of the City, County and State of New

York.

    2.     Plaintiff STEVEN TURNER is a Black man whose father was African-American

and mother is Caucasian and Jewish.  Plaintiff was born in the United States on January 18, 1953

and is presently 53-years-old.

    3.     At all times hereinafter mentioned, Defendant ALEXANDRA INVESTMENT

MANAGEMENT, LLC, was and is a corporation duly organized and existing under and by

virtue of the laws of the State of New York, with its principal place of business in the City of New

York, State of New York.

    4.     Defendant ALEXANDRA INVESTMENT MANAGEMENT, LLC is a global

multi-strategy hedge fund, with approximately $2 billion in assets under its management.

Defendant ALEXANDRA IVNESTMENT MANAGEMENT, LLC was founded in December 1993 by Mikhail Filimonov and Dimitri Sogoloff. Defendant ALEXANDRA INVESTMENT MANAGEMENT, LLC presently has approximately 30 employees.

5.    At all relevant times herein, Defendant ALEXANDRA INVESTMENT MANAGEMENT, LLC has been owned almost exclusively (95%) by Caucasian, Ukrainian-born Americans.

6.    During the period from on or about August 2002 through on or about May 31, 2005, Plaintiff STEVEN TURNER was employed by Defendant ALEXANDRA INVESTMENT MANAGEMENT, LLC. (hereinafter, "ALEXANDRA.")

7.    Commencing approximately August 2002 until approximately July 21, 2003, Plaintiff STEVEN TURNER was employed by Defendant ALEXANDRA as a consultant attorney.

8.    Commencing approximately July 21, 2003 until his wrongful termination on or about May 24, 2005, Plaintiff STEVEN TURNER was employed by Defendant ALEXANDRA as an executive officer, General Counsel and Chief Legal Officer.

9.    Throughout Plaintiff's employment with Defendant ALEXANDRA, commencing from approximately July 1, 2003 through approximately May 31, 2005, Mikhail Filimonov, a Ukraine-born Caucasian, was and continues to be Founder, Chief Executive Officer and Chairman of the Board, a supervisor, manager and employee of Defendant ALEXANDRA. Mikhail Filimonov is Owner of approximately 45% of the firm, and heads Defendant ALEXANDRA's Investment Group. From approximately July 2003 until on or about May 24, 2005, Plaintiff reported to Mikhail Filimonov. At the time of Plaintiff's wrongful termination in May 2005, Mikhail Filimonov was 48-years-old, approximately four-years-younger than Plaintiff.

10.     Throughout Plaintiff's employment with Defendant **ALEXANDRA**, commencing from approximately July 1, 2003 through approximately May 31, 2005, Dimitri Sogoloff, a Ukraine-born Caucasian, was and continues to be Co-Founder, Chief Risk Officer and President, a supervisor, manager and employee of Defendant **ALEXANDRA**.  Dimitri Sogoloff, who is approximately 43-years-old, is Owner of approximately 40% of the firm, and heads Defendant **ALEXANDRA**'s Technology/IT Department and Risk Management, and oversees Accounting/ Finance.  From approximately July 2003 until on or about May 24, 2005, Dimitri Sogoloff was Plaintiff's direct supervisor.  At the time of Plaintiff's wrongful termination in May 2005, Dimitri Sogoloff was 43-years-old, approximately nine-years-younger than Plaintiff.

11.     Throughout Plaintiff's employment with Defendant **ALEXANDRA**, commencing from approximately July 1, 2003 through approximately May 31, 2005, Vadim Iosilevich, a Ukraine-born Caucasian, was and continues to be Partner, Head of Trading, a supervisor, manager and employee of Defendant **ALEXANDRA**.  Vadim Iosilevich is Owner of approximately 10% of the firm.  At the time of Plaintiff's wrongful termination in May 2005, Vadim Iosilevich was 32-years-old, approximately thirteen-years-younger than Plaintiff.

12.     At all times material to this Complaint, the individual owners, partners, officers, directors, supervisors, managers, employees and/or agents mentioned herein, acted within the scope of their duties as owners, partners, officers, directors, supervisors, managers, employees and/or agents of Defendant **ALEXANDRA**.

13.     Jurisdiction of the subject matter of this action is established in this Court under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000-e(f)(3), and under The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 621, et seq.  This is the proper venue for this action under Title

VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States

Code, Section 2000 et seq., and under The Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. Section 621, et seq., in that unlawful acts alleged herein were committed within this

Court's jurisdiction.

14.     On or about March 10, 2006, Plaintiff STEVEN TURNER filed a discrimination

claim with the New York State Division of Human Rights and the EEOC.

15.     On or about November 22, 2006, the EEOC issued a Notice of Right to Sue on

Plaintiff's behalf.


## GENERAL ALLEGATIONS OF RACE, COLOR, NATIONAL ORIGIN AND AGE DISCRIMINATION AND HARASSMENT

16.     The allegations set forth above and below are incorporated by reference as if fully

set forth herein.

17.     Throughout his employment at Defendant ALEXANDRA, Plaintiff STEVEN

TURNER was treated differently than younger employees at the company.

18.     This disparate treatment included different standards of conduct, unequal pay,

unequal benefits, unequal opportunities, unequal promotion, and unequal disciplinary measures

directed toward himself and other older employees as opposed to employees under the age of 40

who were similarly employed by and situated at Defendant ALEXANDRA.

19.     During Plaintiff's employment, there existed at Defendant ALEXANDRA an

ongoing and pervasive corporate culture that favored youthful employees and disfavored older

employees, and manifested in discriminatory conduct against older employees.

20.     The discrimination at Defendant ALEXANDRA against older employees

adversely affected the terms and conditions of Plaintiff's employment, and culminated in Plaintiff STEVEN TURNER's unlawful termination.

21. During Plaintiff STEVEN TURNER's employment, from approximately August 2002 through his termination, Mikhail Filimonov, Dimitri Sogoloff, IT Head Sasha Kouperman, and other executives, officers, managers and supervisors created and maintained a hostile work environment through explicit, rampant, pervasive and continued age discrimination against Plaintiff and other older employees in the office. Under Filimonov's and Sogoloff's direction, Defendant ALEXANDRA became an exclusive club where younger people were promoted and older employees were isolated, rendered impotent or terminated.

22. Throughout his employment at Defendant ALEXANDRA, from approximately August 2002 through his termination, Plaintiff STEVEN TURNER was treated differently than White, Caucasian and/or Ukrainian-born employees.

23. This disparate treatment included different standards of conduct, unequal pay, unequal benefits, unequal opportunities, unequal promotion, and unequal disciplinary measures directed toward myself as opposed to White, Caucasian and/or Ukranian-born employees who were similarly employed by and situated at Defendant ALEXANDRA.

24. The discrimination at Defendant ALEXANDRA against Black and/or African-American and/or non-Urkainian-born employees adversely affected the terms and conditions of Plaintiff's employment, and culminated in Plaintiff STEVEN TURNER's unlawful termination.

25. Within ALEXANDRA there was a permissive and encouraging environment for discrimination and harassment among supervisors, managers and employees of the company against African-American and/or non-Ukrainian-born employees.

26. During Plaintiff STEVEN TURNER's employment, from approximately

August 2002 through his termination, Mikhail Filimonov, Dimitri Sogoloff and IT Head Sasha Kouperman created and maintained a hostile work environment through explicit and continued discrimination and harassment against Plaintiff because of his race, the fact that his parents were in an interracial marriage, the color of his skin, and his national origin.

27.     During the course of his employment, from approximately August 2002 through his termination, Plaintiff STEVEN TURNER was treated by Mikhail Filimonov, Dimitri Sogoloff and Sasha Kouperman, among others, in a demeaning manner, and was treated differently than Defendant ALEXANDRA's White and/or Caucasian and/or Ukranian-born and/or younger employees in identical and/or similar employment circumstances.

## SPECIFIC ALLEGATIONS OF RACE, COLOR, NATIONAL ORIGIN AND AGE DISCRIMINATION AND HARASSMENT

28.     The allegations set forth above and below are incorporated by reference as if fully set forth herein.

29.     Plaintiff STEVEN TURNER graduated from Harvard Law School in 1982. Plaintiff came to Defendant ALEXANDRA with more than 20 years of experience representing various Wall Street financial institutions concerning corporate and securities/regulatory matters. Plaintiff STEVEN TURNER's background included extensive work with derivative/structured products, senior management experience, experience in trading practice and compliance matters, and extensive experience working with hedge fund clients.

30.     Commencing approximately August 2002, Plaintiff STEVEN TURNER was employed as a consultant attorney by Defendant ALEXANDRA.  Plaintiff STEVEN TURNER was hired as a consultant by then Chief Operating Officer/Head of Business Development

Andrew Pernambuco, a Black Wall Street professional with many years experience working in financial institutions.

31.     From approximately August 2002 until approximately April 2004, Plaintiff STEVEN TURNER reported directly to Chief Operating Officer/Head of Business Development Andrew Pernambuco.

32.     In approximately early July 2003, Chief Operating Officer/Head of Business Development Andrew Pernambuco offered Plaintiff STEVEN TURNER a full-time position as an executive officer, General Counsel and Chief Legal Officer of Defendant ALEXANDRA. Plaintiff STEVEN TURNER's promotion was the result of his positive performance as a consultant.

33.     From approximately July 21, 2003 until his wrongful termination on or about May 24, Plaintiff STEVEN TURNER successfully performed the duties of General Counsel and Chief Legal Officer for Defendant ALEXANDRA.

34.     Throughout his employment at Defendant ALEXANDRA, Plaintiff STEVEN TURNER's legal skills and work on behalf of the firm were universally praised as invaluable to the company and exemplary among his peers. All of Plaintiff STEVEN TURNER's performance reviews at ALEXANDRA were positive. Nevertheless, Plaintiff STEVEN TURNER was subjected to increasing discrimination and harassment during the course of his employment.

35.     In approximately April 2004, Chief Operating Officer/Head of Business Andrew Pernambuco was forced out of Defendant ALEXANDRA. Once Andrew Pernambuco's employment was terminated, Plaintiff STEVEN TURNER's position at Defendant ALEXANDRA became more tenuous and his treatment worsened.

36.     Commencing approximately April 2004 through his termination on or about

May 31, 2005, and continuing through the present, Defendant ALEXANDRA has been and continues to be owned almost exclusively (95%) by Ukranian-born Americans.

37.     Throughout Plaintiff STEVEN TURNER's employment from approximately August 2002 through on or about May 31, 2005, 35-40 of the approximately 50 employees at Defendant ALEXANDRA, (or 70-80%), were born in Russia or the Ukraine.

38.     Over the course of Plaintiff's employment at Defendant ALEXANDRA from approximately August 2002 through May 2005, of the firm's approximately 50 employees, only approximately five employees, including Plaintiff STEVEN TURNER, were Black.

39.     During Plaintiff's employment at Defendant ALEXANDRA from approximately August 2002 through May 2005, there were only three Black executives at Defendant ALEXANDRA: Chief Operating Officer/Head of Business Development Andrew Pernambuco, Junior Partner Gena Lovett, and Plaintiff STEVEN TURNER. Following the termination of Andrew Pernambuco's employment in approximately May 2004, there were only two Black executives at Defendant ALEXANDRA: Junior Partner Gena Lovett, and Plaintiff STEVEN TURNER. Plaintiff STEVEN TURNER's employment was terminated in approximately May 2005, leaving Gena Lovett as the sole Black executive at Defendant ALEXANDRA.

40.     Throughout Plaintiff's employment from approximately August 2002 through May, 2005, Gena Lovett, a 5% Junior Partner, headed a 5-6 person staff at Defendant ALEXANDRA responsible for operational support functions. During that time, Gena Lovett was treated disrespectfully and subjected to disparate treatment from the other Ukrainian-born Owners of Defendant ALEXANDRA.

41.     In approximately August 2003, Defendant ALEXANDRA held a 10th Anniversary Party attended by Plaintiff as well as hundreds of ALEXANDRA's employees,

clients, investors and friends. During the course of the celebration, Founder/Chief Executive

Officer Mikhail Filimonov made a speech recognizing and praising the firm's Partners, and called

Dimitri Sogoloff, Vadim Iosilevich and Andrew Pernambuco to join him on stage. In so doing,

Mikhail Filimonov failed to recognize Gena Lovett, who remained on the floor.

42.     In approximately August 2003, immediately after she was publicly snubbed by her

peers at Defendant ALEXANDRA's 10th Anniversary Party, Partner Gena Lovett, humiliated,

turned to Plaintiff STEVEN TURNER and expressed her gratitude that Plaintiff had joined the

firm and could act as her ally.

43.     During Plaintiff's employment at Defendant ALEXANDRA from approximately

August 2002 through May 2005, Defendant temporarily employed only two other Black

employees on approximately two occasions: a Receptionist, and an Operations staff member

named Everett Crawford.

44.     In approximately November 2005, approximately six months after Plaintiff

STEVEN TURNER's wrongful termination, the Operations Group Everett Crawford worked in

was eliminated and Mr. Crawford's employment was terminated. However, Everett Crawford was

the only employee from Operations whose employment was terminated by Defendant

ALEXANDRA. The other group members, Mr. Crawford's Caucasian peers, were either

transferred to other areas (e.g., the Risk Management Group) or remained employed in another

capacity by Defendant ALEXANDRA.

45.     Throughout Plaintiff STEVEN TURNER's employment at Defendant

ALEXANDRA, the average age of ALEXANDRA's employees was approximately 35 to 39-

years-old.

46.     Throughout Plaintiff STEVEN TURNER's employment,  Defendant

ALEXANDRA actively recruited "young blood" as its employees.

47.     Commencing in approximately July 2003, Plaintiff STEVEN TURNER was paid a base salary of $175,000. Plaintiff's base salary was not increased over the following two years.

48.     At the time of his hiring by Defendant ALEXANDRA on or about July 2003, Chief Operating Officer/Head of Business Development Andrew Pernambuco told Plaintiff STEVEN TURNER he could anticipate an approximately $600,000 annual bonus. In approximately November 2003, Managing Partner Mikhail Filimonov told Plaintiff STEVEN TURNER that due to the level of performance he had demonstrated to the Partners, he should receive a year-end annual bonus of approximately $600,000.

49.     In approximately December 2003, Managing Partner Mikhail Filimonov met with Plaintiff STEVEN TURNER and informed Plaintiff he was awarded a $200,000 bonus as a result of his positive contribution to the firm. Plaintiff's annual bonus was significantly less than the amount Managing Partner Mikhail Filimonov discussed with Plaintiff when he was initially hired. Although his bonus was pro-rated over a six-month period, at the promised rate Plaintiff's annual bonus should have been twice as much, i.e., $400,000. Plaintiff STEVEN TURNER's bonus was also significantly less than that awarded to other officers and executives at the firm who were at a comparable level to Plaintiff.

50.     In approximately December 2002, Defendant ALEXANDRA gave Chief Financial Officer Bob Beechinor an annual bonus of approximately somewhere between $2-3 million. Bob Beechinor's position level at the company as Chief Financial Officer was comparable to Plaintiff STEPHEN TURNER's position as Chief Legal Officer.

51.     In approximately December 2003, Chief Financial Officer Bob Beechinor's employment at Defendant ALEXANDRA was terminated for cause. Bob Beechinor was

approximately 47-years-old at the time. Nevertheless, Mr. Beechinor, who had worked at the company approximately four-five years, was paid a $5 million severance package plus shares in the firm's hedge fund, and continued to receive salary and full health benefits for another approximate six months following his termination.

52.     In approximately November 2004, Plaintiff STEPHEN TURNER spoke to Founding Partner Mikhail Filimonov concerning Plaintiff's upcoming annual bonus. During their discussion, Mikhail Filimonov told Plaintiff he had done an excellent job and assured Plaintiff: "Don't worry, you'll be taken care of." Based upon Mikhail Filimonov's representations, Plaintiff STEPHEN TURNER anticipated that his bonus would at least equal that which was initially promised him when he was hired as General Counsel in July 2003, i.e. at least approximately $600,000.

53.     Instead, in approximately December 2004, Defendant ALEXANDRA decreased Plaintiff STEPHEN TURNER's annual bonus by approximately $13,000, from $200,000 for 2003 to $187,000 for 2004, even though Plaintiff only worked approximately six months in 2003. Despite the fact that Defendant ALEXANDRA enjoyed a very successful year in 2004, and despite the fact that Plaintiff continued to receive positive verbal performance reviews, Plaintiff STEPHEN TURNER's 2004 annual bonus was less than the bonus he received for 2003.

54.     Plaintiff STEPHEN TURNER's annual bonus for 2004 was significantly less than the bonuses Defendant ALEXANDRA awarded to Plaintiff's functional peers - management and executive staff.

55.     At the time of his hiring in approximately July 2003, Defendant ALEXANDRA promised Plaintiff STEPHEN TURNER that he would be considered a candidate for partnership in 2004. However, Defendant ALEXANDRA failed to honor its representation.

56.     Commencing approximately March 2004, Plaintiff **STEPHEN TURNER** repeatedly approached Co-Founder/President Dimitri Sogoloff concerning partnership. On each occasion, Dimitri Sogoloff assured Plaintiff **STEPHEN TURNER** that he would get back to Plaintiff in a few months concerning his partnership, and that Defendant **ALEXANDRA** would honor its promise. To the contrary, Co-Founder/President Dimitri Sogoloff reneged on his promise and Defendant **ALEXANDRA** breached its agreement with Plaintiff.

57.     Throughout his employment, Plaintiff **STEPHEN TURNER** was subjected to racist comments from his direct supervisors and from co-workers. In particular, members of the IT Department (which consisted of approximately 20 employees, approximately 19 of whom were White, Ukrainian-American or Russian-American men) directed racist and offensive comments toward Plaintiff.

58.     In approximately February 2004, Defendant **ALEXANDRA**'s employees attended a firm-sponsored ski trip to Park City, Utah. During the trip, Plaintiff **STEPHEN TURNER** was ostracized by Ukranian and Russian employees during skiing activities and social events.

59.     One evening at the ski lodge during the company's ski trip in approximately February 2004, Head of IT Alexander "Sasha" Kouperman asked Plaintiff **STEPHEN TURNER** in front of Co-Founder/President Dimitri Sogoloff and a group of IT employees: "Is it true that your Mother's family is from Russia?" Plaintiff **STEPHEN TURNER** responded: "Yes, they're from Mogilev [Ukraine.]" This response occasioned a round of amused looks and sidebar discussion from Sasha Kouperman and the IT staff.

60.     Moments later during the same evening at the ski lodge during the company's ski trip in approximately February 2004, Plaintiff **STEPHEN TURNER** heard Head of IT Alexander "Sasha" Kouperman comment derisively to the group of IT employees words to the

effect: "That's what happens when a Russian woman is taken by a Black guy!" Mr. Kouperman then made a comment using the archaic and insulting term "Negroes", and a lewd reference about "taking it from a Negro." Plaintiff STEPHEN TURNER was deeply wounded.

61.     Later during the same evening at the ski lodge during the company's ski trip in approximately February 2004, Head of IT Alexander "Sasha" Kouperman approached Plaintiff STEPHEN TURNER again and sarcastically remarked concerning Plaintiff's parentage, words to the effect: "So, that's some mix-up!  How is that for you?"  Plaintiff was offended, but tried to ease the situation by responding: "Well, you know, as in chemistry, whenever you combine two base metals, the resulting alloy is always stronger than the individual base metals." Sasha Kouperman then walked away and, goaded by the IT staff, repeatedly muttered the word "Bronz-a" toward Plaintiff. Co-Founder/Managing Partner Dimitri Sogoloff overheard the racist comments of IT Head Sasha Kouperman and his staff but said and did nothing.

62.     Following the ski trip, from approximately March 2004 until his wrongful termination in May 2005, Head of IT Alexander "Sasha" Kouperman and other members of the IT staff persistently referred to Plaintiff STEPHEN TURNER as "Bronzman Turner" and "Bronze Turner." Plaintiff was offended.

63.     In approximately March 2004, Plaintiff STEPHEN TURNER complained for the first time to Co-Founder/Managing Partner Dimitri Sogoloff about the racist comments made by IT Head Alexander "Sasha" Kouperman and other members of the IT Staff during the company ski trip. Mr. Sogoloff initially pretended that he could not recall the comments, then abruptly remarked: "But I'm sure they meant nothing."

64.     During this conversation in approximately March 2004, Plaintiff STEPHEN TURNER, both in his capacity as General Counsel and as someone who had been subjected to

the humiliation of racist comments by Defendant ALEXANDRA employees, suggested to Co-Founder/Managing Partner Dimitri Sogoloff that Defendant ALEXANDRA could use some race sensitivity training sessions, and that those sessions could start with its IT staff. In so doing, Plaintiff STEPHEN TURNER told Dimitri Sogoloff that the IT Department's employees had evidently never been around a Black attorney, let alone a Black attorney who had a Russian Jewish mother. Co-Founder/Managing Partner Dimitri Sogoloff indicated he would "talk to them" but was otherwise dismissive. Unfortunately, nothing was done.

65.    Throughout Plaintiff's employment from approximately July 2003 through May 24, 2005, Defendant ALEXANDRA never had a Human Resources Department. Throughout that time, employees were never instructed concerning discrimination and harassment in the workplace. Unfortunately, Plaintiff's suggestion of race sensitivity training was ignored.

66.    In approximately March 2004, African-American Junior Partner Gena Lovett complained to Plaintiff STEVEN TURNER in a series of private meetings that she did not believe she was being fairly compensated under the Firm's LLC Operating Agreement.

67.    In approximately March 2004, African-American Chief Operating Officer/Head of Business Development Andrew Pernambuco complained to Plaintiff STEVEN TURNER in a series of private meetings that he did not believe he was being fairly compensated under the Firm's LLC Operating Agreement. In so doing, Andrew Pernambuco repeatedly stated that even though he had brought approximately $500 million to the firm (which forced Defendant ALEXANDRA's Partners to give him a 10% ownership), Partners Mikhail Filimonov and Dimitri Sogoloff still treated him "like a second-class citizen" and he felt he was being discriminated against as a Black man.

68.    In approximately April 2004, Chief Operating Officer, Head of Business

Development and 10% Owner Andrew Pernambuco was forced to resign. Immediately before his departure, Andrew Pernambuco warned Plaintiff **STEPHEN TURNER** that he could no longer protect Plaintiff from Founder/Chief Executive Officer Mikhail Filimonov and Co-Founder/President Dimitri Sogoloff, that Mr. Filimonov and Mr. Sogoloff would undoubtedly view Plaintiff with suspicion because of his race and because he was not Ukranian or Russian, that Plaintiff should keep his eyes open since neither were to be trusted, and that Plaintiff should be wary of them.

69.     In approximately May 2004, shortly after Andrew Pernambuco's departure from Defendant **ALEXANDRA**, Founder/President Dimitri Sogoloff turned to Plaintiff **STEPHEN TURNER** at the conclusion of a meeting and commented in a snide manner: "Was there affirmative action when you were attending Harvard Law School?" Plaintiff **STEPHEN TURNER** was shocked and stood still before quietly responding: "Maybe the race sensitivity needs to start right here at the top." Dimitri Sogoloff was non-responsive.

70.     Following this meeting, commencing approximately May 2004 until Plaintiff's wrongful termination in May 2005, Co-Founder/President Dimitri Sogoloff treated Plaintiff **STEPHEN TURNER** in an increasingly hostile manner. Dimitri Sogoloff rarely communicated directly with Plaintiff and was increasingly evasive when Plaintiff attempted to meet with him in person or speak to him on the telephone. In addition, Plaintiff **STEPHEN TURNER** was increasingly excluded from the partnership meetings he formerly attended as part of his duties as General Counsel.

71.     In approximately July 2004, Plaintiff **STEPHEN TURNER** heard IT Head Alexander "Sasha" Kouperman comment sarcastically about Plaintiff as he passed Kouperman's office on the 6th Floor: "We've got a real strong alloy for a lawyer/General Counsel."

72.     During the course of the Summer, from approximately July through September 2004, IT Staff not only continued to refer to Plaintiff STEPHEN TURNER as "Bronzman Turner," but on approximately three to four occasions, made such comments directly to Plaintiff's face, including: "Watch out for Bronzman Turner, he's not one of our alloys." These comments were met with peals of raucous laughter.

73.     During the course of the Summer from approximately July through September 2004, Plaintiff STEPHEN TURNER repeatedly complained to Co-Founder/President Dimitri Sogoloff and to Co-Founder/Chief Executive Officer Mikhail Filimonov about this racially hostile work environment. Rather than redressing Plaintiff's concerns, Dimitri Sogoloff and Mikhail Filimonov greeted Plaintiff STEPHEN TURNER's complaints with increasing antagonism and belligerence.

74.     In approximately September 2004, after Plaintiff STEPHEN TURNER had repeatedly complained about the racially-hostile work environment and about the need for employee-training concerning discrimination, Plaintiff's office was moved from the luxurious 40th floor where the Directors and firm clients sat to the relatively dreary 6th Floor where the IT Department and Administration were located. Plaintiff STEPHEN TURNER reached his office by a separate elevator than that used by the executives. Although Co-Founder/Chief Executive Officer Mikhail Filimonov told Plaintiff STEPHEN TURNER that ALEXANDRA would keep a desk for Plaintiff on the 40th floor, given how closely Plaintiff needed to work with his trading staff, that never occurred. Plaintiff STEPHEN TURNER's status at the company had clearly changed for the worse. Plaintiff STEPHEN TURNER's demotion to the 6th Floor was in direct retaliation for his complaints concerning discrimination.

75.     After his office was relocated to the 6th floor commencing in approximately

September 2004, Plaintiff STEPHEN TURNER was subjected to even more harassment.

76.      In approximately September and October 2004, Plaintiff STEPHEN TURNER was repeatedly ridiculed by members of the IT Staff who professed disbelief that Plaintiff, a Black man, would take time off to observe the Jewish holidays, including Passover.  Defendant ALEXANDRA's IT Staff also made numerous jokes about Plaintiff as a Black man attending Bar Mitzvah's.  Plaintiff STEPHEN TURNER felt humiliated.

77.      Commencing approximately November 2004 through January 2005, members of Defendant ALEXANDRA's IT Staff in the presence of IT Head Alexander "Sasha" Kouperman repeatedly joked about Plaintiff STEPHEN TURNER's wearing a yarmulke with an Afro, asking Plaintiff with mock consternation questions such as: "How could you keep your yarmulke on your head when you were young with an Afro?"   Plaintiff STEPHEN TURNER found these comments particularly offensive.

78.      On repeated occasions between approximately November 2004 through January 2005, Plaintiff STEPHEN TURNER complained to Co-Founder/Chief Executive Officer Mikhail Filimonov about the discriminatory and harassing comments made to him by IT Head Alexander "Sasha" Kouperman and his Staff. Co-Founder/Chief Executive Officer Mikhail Filimonov told Plaintiff he should deal directly with Co-Founder/President Dimitri Sogoloff rather than disturb him.  In so doing, Mikhail Filimonov made it clear that he wanted such matters swept under the rug.

79.      On repeated occasions between approximately November 2004 through January 2005, Plaintiff STEPHEN TURNER complained to Co-Founder/President Dimitri Sogoloff about the discriminatory and harassing comments made to him by IT Head Alexander "Sasha" Kouperman and his Staff. Co-Founder/President Dimitri Sogoloff routinely responded with

anger, to the effect: "Look, I've taken care of this. Please don't bother me with this anymore." Unfortunately, nothing was done and the harassment did not stop.

80.     On repeated occasions in approximately February 2005, IT Head Alexander "Sasha" Kouperman and his Staff made several sarcastic comments to Plaintiff **STEPHEN TURNER** regarding whether Plaintiff received "full credit affirmative action" at Harvard Law School since Plaintiff's mother is White.

81.     On repeated occasions in approximately February 2005, IT Head Alexander "Sasha" Kouperman and his Staff further made sarcastic comments concerning Plaintiff's law degree, asking whether Plaintiff **STEPHEN TURNER** received "the same law degree under affirmative action."

82.     In approximately March 2005, Plaintiff **STEPHEN TURNER** yet again complained to Co-Founder/President Dimitri Sogoloff about the racist and offensive comments made to him by IT Head Alexander "Sasha" Kouperman and his Staff. Plaintiff told Dimitri Sogoloff that Defendant **ALEXANDRA's** hostile work environment was "corrosive" and that race sensitivity sessions were urgently needed. Co-Founder/President Dimitri Sogoloff blew up at Plaintiff, responding that he had already discussed the issues with IT Head Sasha Kouperman, and that Kouperman had informed him that Plaintiff **STEVEN TURNER** was "very arrogant around him and the IT Staff." Co-Founder/President Dimitri Sogoloff then instructed Plaintiff **STEVEN TURNER** to get back to work.

83.     In approximately March 2005, after receiving no constructive response from Co-Founder/President Dimitri Sogoloff, Plaintiff **STEVEN TURNER** again complained to Co-Founder/Chief Executive Officer Mikhail Filimonov about the ongoing racial harassment. Plaintiff **STEVEN TURNER** explained to Mikhail Filimonov that his primary concern was that

Defendant ALEXANDRA's Staff respect Plaintiff as General Counsel for the firm. Unfortunately, Co-Founder/Chief Executive Officer Mikhail Filimonov refused to take appropriate measures to remedy the situation.

84. In approximately October 2004, Defendant ALEXANDRA commenced a search for a Compliance Officer to work with Plaintiff. Plaintiff STEVEN TURNER suggested and interviewed approximately five candidates - two of whom were women, and one who was Asian. All of these candidates had extensive experience and were very qualified for Defendant ALEXANDRA's needs. However, Plaintiff's suggestions were ignored.

85. Instead, in approximately April 2005, Defendant ALEXANDRA hired an approximately 36-year-old White attorney, Mark Polemni. At the time, Mark Polemni only had approximately 13-years experience as an attorney, primarily at a labor law firm, and had virtually no experience in securities law/trading practices. In comparison, Plaintiff STEVEN TURNER had approximately 12-years-experience working with and advising as clients some of the largest hedge funds in the world, and approximately 19-years-experience in a broad array of private equity transactions. After Mark Polemni started in approximately April 2005, Plaintiff STEVEN TURNER was instructed to cross-train and familiarize him with all that Plaintiff did and knew professionally. Plaintiff STEVEN TURNER did so willingly in the spirit of "teamwork."

86. Commencing approximately April 2005, Defendant ALEXANDRA provided Mark Polemni with a significantly higher compensation package than Plaintiff STEVEN TURNER, even though Plaintiff had significantly more experience than Mark Polemni. Defendant ALEXANDRA gave Mark Polemni a starting base salary of approximately $300,000 and a guaranteed bonus of approximately $300,000. In addition, Defendant ALEXANDRA paid Mark Polemni a significant sign-on bonus. Even though Plaintiff had been an attorney twice

as long as Mark Polemni and had approximately 20 more years experience in securities, Plaintiff STEVEN TURNER's base salary was approximately $100,000 less and his annual bonus approximately $113,000 less than Mark Polemni's base salary and annual bonus. Moreover, Defendant ALEXANDRA did not pay Plaintiff STEVEN TURNER a sign-on bonus.

87.     In approximately April 2005, Plaintiff STEVEN TURNER once again complained to Co-Founder/President Dimitri Sogoloff that he was increasingly isolated from the company's decision makers, and continued to be the butt of off-color, racially offensive harassment. As usual, Dimitri Sogoloff acted personally affronted by Plaintiff's complaint, and was hostile and defensive. Nothing was done to redress Plaintiff STEVEN TURNER's concerns.

88.     On or about May 20, 2005, Plaintiff STEVEN TURNER met with Co-Founder/ Chief Executive Officer Mikhail Filimonov and expressed his growing concern that Mark Polemni was encroaching on Plaintiff's responsibilities as General Counsel. Mikhail Filimonov shrugged his shoulders and instructed Plaintiff STEVEN TURNER to continue working out a "division of labor," since Mark Polemni and Plaintiff would both play a central role in the coming months as the firm geared up for SEC registration.

89.     Approximately four days later, on or about May 24, 2005, Plaintiff STEVEN TURNER was summoned to a meeting with Junior Partner Gena Lovett in her office where, without prior warning, provocation or cause, Plaintiff's employment was abruptly terminated by Defendant ALEXANDRA. Defendant ALEXANDRA refused to provide any explanation for Plaintiff's firing. Plaintiff STEVEN TURNER was told his termination was effective immediately, and instructed not to contact Co-Founder/Chief Executive Officer Mikhail Filimonov or Co-Founder/President Dimitri Sogoloff. Plaintiff STEVEN TURNER was also offered a six-month severance package.

90.     At the time of his termination on or about May 24, 2005, Plaintiff STEVEN TURNER was 52-years-old, and the oldest employee at Defendant ALEXANDRA.

91.     Approximately one week later, on or about May 30, 2005, Plaintiff STEVEN TURNER was contacted by a newly-hired Human Resources Representative and informed that any communications from him were to be directed to her in writing.

92.     Plaintiff STEVEN TURNER's firing was in direct retaliation for his complaints of discrimination and harassment, and a culmination of the discrimination at Defendant ALEXANDRA against Blacks and/or African-Americans in particular, as well as against non-Ukranian-born employees and employees over the age of 40.

93.     In approximately June 2005, Mark Polemni assumed Plaintiff STEVEN TURNER's position at Defendant ALEXANDRA as General Counsel.

94.     As a consequence of Defendant ALEXANDRA's discriminatory conduct, Plaintiff STEVEN TURNER has suffered and continues to suffer severe emotional distress, including depression, anxiety, sleep disturbance, and emotional upset.  Moreover, since his wrongful termination, Plaintiff STEVEN TURNER has suffered significant economic loss, including but not limited to loss of income and benefits.

## AS AND FOR A FIRST CAUSE OF ACTION
### TITLE VII -RACE DISCRIMINATION

95.     Plaintiff STEVEN TURNER  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

96.     The aforesaid acts of intentional race discrimination against African-Americans

and/or Blacks by Defendant **ALEXANDRA**, its officers, partners, directors, executives, supervisors, managers and/or employees, violated Plaintiff **STEVEN TURNER**'s rights as provided under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

97.     As a consequence of Defendant's race discrimination against Blacks and/or African-Americans while Plaintiff was an employee of Defendant **ALEXANDRA**, Plaintiff sustained conscious pain and suffering, great mental distress, physical injury, shock and humiliation. In addition, Plaintiff incurred monetary loss as he was subjected to adverse employment actions, including disparate pay, culminating in his wrongful termination.

98.     As a consequence of the foregoing misconduct of Defendant **ALEXANDRA**, Plaintiff **STEVEN TURNER** has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and attorneys fees.

## AS AND FOR A SECOND CAUSE OF ACTION
## NYSHRL - RACE DISCRIMINATION

99.     Plaintiff **STEVEN TURNER**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

100.     The aforesaid acts of intentional race discrimination against African-Americans by Defendant **ALEXANDRA**, its officers, partners, directors, executives, supervisors, managers and/or employees, violated Plaintiff **STEVEN TURNER**'s rights as provided under New York

State Human Rights Law - Executive Law Section 290 et. seq.

101.    As a consequence of Defendant's racial discrimination against African-Americans while Plaintiff was an employee of Defendant ALEXANDRA, Plaintiff sustained conscious pain and suffering, physical injury, great mental distress, shock and humiliation.  In addition, Plaintiff incurred monetary loss as he was subjected to adverse employment actions, including disparate pay, culminating in his wrongful termination.

102.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged  in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A THIRD CAUSE OF ACTION
## NYCHRL - RACE DISCRIMINATION

103.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

104.    The aforesaid discriminatory acts by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers, and/or employees, perpetrated against Plaintiff STEVEN TURNER because of his African-American race violated Plaintiff STEVEN TURNER's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

105.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

106.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA**,

Plaintiff **STEVEN TURNER** has been damaged and is entitled to compensatory damages and

punitive damages in the sum prescribed by NYC Human Rights Law Title 8, <u>et. seq.</u>, i.e.,

compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and

punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as

attorneys fees.

### AS AND FOR A FOURTH CAUSE OF ACTION
### TITLE VII - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT

107.    Plaintiff **STEVEN TURNER**  repeats and realleges each and every allegation

contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more

fully set forth at length herein.

108.    The aforesaid acts of intentional racial harassment, including the hostile work

environment for African-Americans and/or Blacks, perpetrated by Defendant **ALEXANDRA**,

its officers, partners, directors, executives, supervisors, managers, and/or employees, violated

Plaintiff **STEVEN TURNER**'s rights as provided under Title VII of the United States Civil

Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

109.    As a consequence of Defendant's racial harassment and the racially hostile work

environment while Plaintiff was an employee of Defendant **ALEXANDRA**, Plaintiff sustained

conscious pain and suffering, great mental distress and humiliation.

110.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA**,

Plaintiff **STEVEN TURNER** has sustained damage in the sum of THREE HUNDRED

THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED

THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and

attorneys fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NYSHRL - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT

111.    Plaintiff STEVEN TURNER  repeats and realleges each and every allegation

contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more

fully set forth at length herein.

112.    The aforesaid acts of intentional racial harassment, including a hostile work

environment for African-Americans and/or Blacks, by Defendant ALEXANDRA, its officers,

partners, directors, executives, supervisors, managers and/or employees, violated Plaintiff

STEVEN TURNER's rights as provided under New York State Human Rights Law - Executive

Law Section 290 et. seq.

113.    As a consequence of Defendant ALEXANDRA's racial harassment and its

racially hostile work environment while Plaintiff was an employee of Defendant ALEXANDRA,

Plaintiff sustained conscious pain and suffering, physical injury, great mental distress and

humiliation.  In addition, Plaintiff  incurred monetary loss as he was subjected to adverse

employment actions, including disparate pay, culminating in his wrongful termination.

114.    As a consequence of the foregoing misconduct of Defendant URBAN

OUTFITTERS, INC., Plaintiff STEVEN TURNER has been damaged  in the sum of

TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.


## AS AND FOR A SIXTH CAUSE OF ACTION
## NYCHRL - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT

115.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation

contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

116.    The aforesaid discriminatory acts by Defendant **ALEXANDRA**, its officers, partners, directors, executives, supervisors, managers and/or employees, perpetrated against Plaintiff **STEVEN TURNER** because he is African-American violated Plaintiff **STEVEN TURNER**'s rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

117.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA**, Plaintiff **STEVEN TURNER** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

118.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA**, Plaintiff **STEVEN TURNER** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## TITLE VII - NATIONAL ORIGIN DISCRIMINATION

119.    Plaintiff **STEVEN TURNER**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

120.    The aforesaid acts of intentional race discrimination against non-Ukranian-born employees by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers and/or employees, violated Plaintiff STEVEN TURNER's rights as provided under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

121.    As a consequence of Defendants' national origin discrimination against employees born outside of Russia during Plaintiff's employment at Defendant ALEXANDRA, Plaintiff sustained conscious pain and suffering, great mental distress, physical injury, shock, fright and humiliation. In addition, Plaintiff incurred monetary loss as he was subjected to adverse employment actions, including disparate pay, culminating in his constructive termination.

122.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages plus economic damages and attorneys fees.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## NYSHRL - NATIONAL ORIGIN DISCRIMINATION

123.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

124.    The aforesaid acts of intentional national origin discrimination against non-Ukranian-born employees by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers and/or employees, violated Plaintiff STEVEN TURNER's

rights as provided under New York State Human Rights Law - Executive Law Section 290 <u>et.</u> <u>seq.</u>

125.    As a consequence of Defendant's national origin discrimination against non-Ukranian-born employees while Plaintiff was an employee of Defendant ALEXANDRA, Plaintiff sustained conscious pain and suffering, physical injury, great mental distress, shock, fright and humiliation. In addition, Plaintiff incurred monetary loss as he was subjected to adverse employment actions, including disparate pay, culminating in his constructive termination.

126.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A NINTH CAUSE OF ACTION
## NYCHRL - NATIONAL ORIGIN DISCRIMINATION

127.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

128.    The aforesaid discriminatory acts by Defendants ALEXANDRA, its officers, partners, directors, executives, supervisors, managers and/or employees, perpetrated against Plaintiff STEVEN TURNER because he was not born in Russia violated Plaintiff STEVEN TURNER's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), <u>et. seq.</u>

129.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and

humiliation, and incurred economic loss.

130.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA,**
Plaintiff **STEVEN TURNER** has been damaged and is entitled to compensatory damages and
punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e.,
compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and
punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as
attorneys fees.

## AS AND FOR A TENTH CAUSE OF ACTION
### ADEA - AGE DISCRIMINATION

131.    Plaintiff **STEVEN TURNER** repeats and realleges each and every allegation
contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more
fully set forth at length herein.

132.    The aforesaid acts by Defendant **ALEXANDRA,** its officers, partners, directors,
executives, supervisors, managers and/or employees, violated Plaintiff **STEVEN TURNER**'s
rights as provided under The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.
Section 621, et. seq.

133.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA,**
Plaintiff **STEVEN TURNER** sustained conscious pain and suffering, great mental distress, and
humiliation, and incurred economic loss.

134.    As a consequence of the foregoing misconduct of Defendant **ALEXANDRA,**
Plaintiff **STEVEN TURNER** has been damaged and is entitled to economic damages and
liquidated damages as provided under 29 U.S.C. Section 626(b) and 216(b), i.e., FIFTY

MILLION ($50,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## NYSHRL - AGE DISCRIMINATION

135.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation

contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more

fully set forth at length herein.

136.    The aforesaid discriminatory acts by Defendant ALEXANDRA, its officers,

partners, directors, executives, supervisors, managers and/or employees, perpetrated against

Plaintiff STEVEN TURNER because of his age, violated Plaintiff STEVEN TURNER's rights

as provided under The New York State Human Rights Law, Article 15 of the New York

Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, et. seq.

137.    As a consequence of the foregoing misconduct of Defendants ALEXANDRA,

Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and

humiliation, and incurred economic loss.

138.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA,

Plaintiff STEVEN TURNER has been damaged and is entitled to compensatory and economic

damages as provided under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of TWENTY-

FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## NYCHRL - AGE DISCRIMINATION

139.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation

contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more

fully set forth at length herein.

140.    The aforesaid discriminatory acts by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers, and/or employees, perpetrated against Plaintiff STEVEN TURNER because of his age violated Plaintiff STEVEN TURNER's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

141.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

142.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### TITLE VII - RETALIATION

143.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

144.    The aforesaid acts of intentional retaliation by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers and/or employees, perpetrated against Plaintiff because he complained of unlawful discrimination and harassment, violated Plaintiff STEVEN TURNER's rights as provided under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

145.    As a consequence of Defendant's retaliation against Plaintiff during his employment at Defendant ALEXANDRA, Plaintiff sustained conscious pain and suffering, great mental distress, and humiliation, and incurred monetary loss and various adverse employment actions, including but not limited to lack of promotion, demotion, disparate pay, and ultimately his unlawful termination.

146.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and attorneys fees.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
## NYSHRL - RETALIATION

147.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

148.    The aforesaid acts of intentional retaliation against Plaintiff by Defendant ALEXANDRA, its officers, partners, directors, executives, supervisors, managers and/or employees, because Plaintiff complained of unlawful discrimination and harassment, violated Plaintiff STEVEN TURNER's rights as provided under New York State Human Rights Law - Executive Law Section 290 et. seq.

149.    As a consequence of Defendant's retaliation against Plaintiff while he was an employee of Defendant ALEXANDRA, Plaintiff sustained conscious pain and suffering, great mental distress and humiliation, and incurred monetary loss, and was subjected to other adverse

employment actions, including but not limited to lack of promotion, demotion, disparate pay, and ultimately his unlawful termination.

150.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged  in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## NYCHRL -RETALIATION

151.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

152.    The aforesaid intentional retaliation by Defendant ALEXANDRA,  its officers, partners, directors, executives, supervisors, managers and/or employees, perpetrated against Plaintiff STEVEN TURNER because Plaintiff complained of unlawful discrimination and harassment, violated Plaintiff STEVEN TURNER's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

153.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

154.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and

punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
## §1981 - RACE DISCRIMINATION

155.    Plaintiff STEVEN TURNER repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

156.    Because he is African-American, Defendant ALEXANDRA denied Plaintiff STEVEN TURNER the same right to make and enforce contracts as enjoyed by White citizens employed by Defendant, including rights involving the making, performance, modification, and termination of contracts with Defendant, as well as the enjoyment of all benefits, privileges, terms, and conditions of that relationship, in violation of 42 U.S.C. §1981.

157.    In the employment practices described above, Defendant ALEXANDRA intentionally engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiff STEVEN TURNER, entitling him to punitive damages.

158.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

159.    As a consequence of the foregoing misconduct of Defendant ALEXANDRA, Plaintiff STEVEN TURNER has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by 42 U.S.C. §1981, i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

WHEREFORE, Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the First Cause of Action in the amount of SIX HUNDRED THOUSAND ($600,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Second Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Third Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Fourth Cause of Action in the amount of SIX HUNDRED THOUSAND ($600,000.00); Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Fifth Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Sixth Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Seventh Cause of Action in the amount of SIX HUNDRED THOUSAND DOLLARS ($600,000.00); Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Eighth Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; and Plaintiff **STEVEN TURNER** demands judgment against Defendants **ALEXANDRA** in the Ninth Cause of Action in the amount of FIFTY MILLION DOLLARS ($50,000,000.00); Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Tenth Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **STEVEN TURNER** demands judgment against Defendant **ALEXANDRA** in the Eleventh Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **STEVEN**

TURNER demands judgment against Defendant ALEXANDRA in the Twelfth Cause of

Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff STEVEN

TURNER demands judgment against Defendant ALEXANDRA in the Thirteenth Cause of

Action in the amount of SIX HUNDRED THOUSAND ($600,000.00) DOLLARS; Plaintiff

STEVEN TURNER demands judgment against Defendant ALEXANDRA in the Fourteenth

Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS;

Plaintiff STEVEN TURNER demands judgment against Defendant ALEXANDRA in the

Fifteenth Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; and

Plaintiff STEVEN TURNER demands judgment against Defendants ALEXANDRA in the

Sixteenth Cause of Action in the amount of FIFTY MILLION DOLLARS ($50,000,000.00); all

together with the costs and disbursements of this action, including attorneys fees, plus interest,

and for any other relief which this Court deems just and proper.

Dated:  New York, New York
        January 5, 2007

                    MORELLI RATNER PC

                    By: _____
                        MARTHA M. McBRAYER, ESQ. (MM-7097)
                        950 Third Avenue, 11th Floor
                        New York, New York 10022
                        (212) 751-9800